UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANDREW NICKELS,

Defendant.

Case No. 23-cr-20434

Hon. Laurie J. Michelson

## UNITED STATES' SENTENCING MEMORANDUM

The State of Michigan held its general election on November 3, 2020, and then certified its election results on November 23, 2020.  Prior to this certification, Defendant Andrew Nickels left a voicemail for the victim (hereinafter, "Public Official"), a clerk in Rochester Hills, Michigan responsible for overseeing and administering elections.  In his voicemail, Nickels accused the Public Official of committing election fraud and repeatedly threatened her life:

- "[Y]ou frauded out America of a real election . . . .  Guess what, you're gonna pay for it, you will pay for it."

- "[T]en million plus patriots will surround you when you least expect it, and your little infantile Deep State security agency has no time to protect you because they'll be bought out and *we'll fucking kill you*."

- "We will fucking demand an audit, we will demand the truth, and *you will fucking pay*. . . ."

1

- *"We will fucking take you out*."

- *"*Fuck your family, fuck your life, and *you deserve a fucking throat to the knife . . . watch your fucking back*, you fucking silly bitch, *watch your fucking back* [inaudible] bitch."

Nickels left this voicemail message to instill fear in the Public Official simply for her role in administering an election because he was angry about the outcome. In leaving this message, he wanted to intimidate this public official into doing her job differently.   Threats such as those that Nickels made represent a growing problem of national concern.  As is true in this case, threats leave public officials who administer elections fearful for their lives and for the safety of their families. Such threats undermine the rule of law, and they create conditions of fear and intimidation for public officials and government workers that challenge core tenets of our democracy.

For the reasons discussed below, a sentence within the Guidelines range that reflects an upward departure of three offense levels under U.S.S.G. § 3A1.4, cmt. n.4, but is not less than 24 months of imprisonment, is sufficient but not greater than necessary to comply with the purposes outlined in 18 U.S.C. § 3553.  If this Court were to find that Nickels's Guidelines range is below 24 months, the United States respectfully requests that the Court grant an upward variance in this case.

## I.    BACKGROUND

In November 2020, the Public Official served as the Clerk for Rochester Hills, Michigan.  (PSR, ¶ 6.)  In this role, the Public Official administered federal, state, and local elections and oversaw an office that maintained voter registration files for the city.[1]

On November 3, 2020, Michigan held its general election.[2]  Shortly after the general election, nationwide media channels publicized unsubstantiated allegations that the Public Official and her locality, Rochester Hills, had deleted or modified election files at the time of the 2020 presidential election that allegedly caused thousands of votes for one candidate to be counted for another candidate.  (PSR, ¶ 8.)  On November 23, 2020, Michigan's State Board of Canvassers certified the state's election results.[3]

On November 10, 2020, Nickels called the office line of the Public Official, leaving the following voicemail:

> Hi [Full Name of Public Official].  This is, uh, pissed off patriots of America, 72-plus million of us, actually even more than that. We're watching your fucking RINO bitch-ass cunt thunder cunt

---

[1]  Rochester Hills, Michigan City Clerk: Elections, https://www.rochesterhills.org/departments/clerk/elections/index.php (last visited July 2, 2024).

[2]  Office of the Michigan Sec'y of State, Elections: 2020 Election Information, *available at* https://mielections.us/election/candlist/2020GEN_CANDLIST.html (last visited July 2, 2024).

[3]  Alison Durkee, *Michigan Election Board Certifies Vote Despite GOP Pressure*, Forbes (Nov. 23, 2020), https://www.forbes.com/sites/alisondurkee/2020/11/23/michigan-election-board-certifies-vote-despite-gop-pressure/.

ass mouth talk about how you think that there's no irregularities. Guess what, the CIA and Deep State under Obama's fucking little dick, and guess what, they used the hammer device, they used the score card.  And you frauded out America of a real election, where Donald Trump blew your fucking lying ass out of the water.  Guess what, you're gonna pay for it, you will pay for it.  You should be in prison if not the least bit you should be fucking executed under federal prison.  We'll send you to Terre Haute Penitentiary.  And you can live in isolation the rest of your life.  Otherwise, ten million plus patriots will surround you when you least expect it, and your little infantile Deep State security agency has no time to protect you because they'll be bought out and we'll fucking kill you.  You fucking thunder cunt fucking bitch liar.  We will fucking demand an audit, we will demand the truth, and you will fucking pay for your fucking lying ass remarks you fucking thunder cunt bitch ass fucking little liberal ass lying RINO.  We will fucking take you out.  Fuck your family, fuck your life, and you deserve a fucking throat to the knife, you fucking cunt, watch your fucking back, you fucking silly bitch, watch your fucking back [inaudible] bitch.

(PSR, ¶ 6.)  Nickels reportedly was upset over the outcome of the 2020 election.  (*Id.* ¶ 10.)

Upon listening to the November 10, 2020 voicemail from Nickels, the Public Official felt fearful for her life.  Nickels's voicemail terrorized the Public Official, who took measures to protect herself and her family in response to Nickels's threatening statements.  (*Id.* ¶ 8.)  For instance, the Public Official added cameras and installed additional flood lights around the exterior of her home.  (*Id.*)

On July 26, 2023, Nickels was charged by indictment with one count of

making an interstate threatening communication, in violation of 18 U.S.C. § 875(c). (Indictment, ECF No. 1, PageID.1). On February 27, 2024, this Court accepted Nickels's guilty plea to Count One, making an interstate threatening communication, in violation of 18 U.S.C. § 875(c), without a Rule 11 plea agreement. In pleading guilty, Nickels admitted that, by leaving the voicemail message described above, he "knowingly transmitted a communication in interstate commerce containing a true threat to injure another person," and that he did so "for the purpose of issuing a threat . . . and with knowledge that the communication would be viewed as a threat." (*Id.*). By pleading to the indictment, Nickels also acknowledged that this voicemail contained a "true threat" as charged in the indictment, meaning that he meant to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals and that a reasonable recipient would have interpreted this voicemail as a true threat.[4]

## II.    U.S. SENTENCING GUIDELINES RANGE

### A.    Presentence Investigation Report

The Probation Department calculates Nickels's Guidelines range to be 10 to 16 months. (PSR, ¶ 58). On June 14, 2024, the United States submitted objections

---

[4] *Virginia v. Black*, 538 U.S. 343, 359 (2003) (defining "true threat"); *United States v. Doggart*, 906 F.3d 506, 510 (6th Cir. 2018) (holding that, for a conviction under 18 U.S.C. § 875(c), the government must prove that: "(1) the defendant sent a message in interstate commerce; (2) a reasonable observer would view the message as a threat; and (3) the defendant intended the message as a threat").

to the PSR.  In part, the United States objected on the following grounds: (1) an upward departure under U.S.S.G. § 3A1.4, cmt. n.4, an application note for the terrorism enhancement, is warranted; and (2) U.S.S.G. § 2A6.1(b)(6), the single instance adjustment, does not apply.[5]  (ECF No. 20, PageID.120-123.)  As to the upward departure under U.S.S.G. § 3A1.4, cmt. n.4, the United States submits that an increase of three offense levels is appropriate here.

If the Court were to accept the United States's position (*i.e.*, that U.S.S.G. § 2A6.1(b)(6) does not apply, and that an upward departure of three levels under U.S.S.G. § 3A1.4, cmt. n.4 applies), Nickels's Guidelines range is 30 to 37 months. If the Court finds that the single instance adjustment applies with the three-level upward departure, then Nickels's Guidelines range is 18-24 months.

---

[5]  The United States also submitted that the Judiciary Sentencing Information (JSIN) statistics to describe "defendants with similar records who have been found guilty of similar conduct" should be modified to include only those cases in which the court applied the Public Official Victim Related Adjustment, U.S.S.G. §3A1.2(b).  (PSR, ¶ 84; *id.*, ECF No. 20, PageID.122-123.)  In particular, the computation in this paragraph is based on "defendants whose primary guideline was §2A6.1," an offense that includes threats to individuals other than public officials or government employees.

The offense charged here is materially different because the offense involves a threat to a public official and the offense of conviction was motivated by such status. Further, the conduct here threatens the ability of Michigan to conduct free and fair elections and the rule of law itself.  The United States understands from the Probation Office that limiting the case comparators to those in which the court applied U.S.S.G. §3A1.2(b) is not available with the current Judiciary Sentencing Information tool.  (PSR, ECF No. 20, PageID.123.)  Below, the United States discusses several cases involving threats to election officials that the United States respectfully submits are more accurate comparators to the case at hand than the generalized threats cases encapsulated by the JSIN statistics.

Based on the Court's ruling on pending objections, Nickels's potential Guidelines ranges are listed below:

| Offense Level | (1) | (2) |
|---|---|---|
| Base (U.S.S.G. § 2A6.1(a)(1)) | 12 | 12 |
| Public Official Victim (U.S.S.G. § 3A1.2(b)) | +6 | +6 |
| Single Instance with No Deliberation (U.S.S.G. § 2A6.1(b)(6)) | N/A | -4 |
| **Subtotal** | 18 | 14 |
| Acceptance of Responsibility [6] | -2 | -2 |
| **Subtotal** | **16** | **12** |
| *Sentencing Range (Months)* | 21-27 | 10-16 |
| | | |
| Terrorism Upward Departure (U.S.S.G.  § 3A1.4, cmt. n.4) | +3 | +3 |
| **Subtotal** | **19** | **15** |
| *Sentencing Range (Months)* | 30-37 | 18-24 |

Nickels pled guilty to the indictment without a Rule 11 plea agreement. The parties have no agreements as to sentencing.

B.   Upward Departure Under Application Note 4 for Terrorism Enhancement, U.S.S.G. § 3A1.4

The government respectfully requests that the Court apply an upward departure based upon Application Note 4 for the terrorism enhancement, pursuant to U.S. Sentencing Guidelines § 3A1.4 n.4. The terrorism enhancement at U.S.S.G.

---

[6]  The Probation Office provided Nickels with a decrease of two offense levels for acceptance of responsibility. (PSR, ¶ 23.) Given that Nickels pled guilty very close to trial, the United States concurs in not providing Nickels with a decrease of a third acceptance of responsibility level under U.S.S.G. § 3E1.1(b).

§3A1.4 applies only to federal crimes of terrorism, as that term is used in 18 U.S.C.

§ 2332b(g)(5).  *See* U.S.S.G. §3A1.4, Application Note 1.  However, Application

Note 4 to this adjustment provides that "an upward departure would be warranted"

in cases that *do not involve* federal crimes of terrorism where "the offense was

calculated to influence or affect the conduct of government by intimidation or

coercion, *or* to retaliate against government conduct but the offense involved, or was

intended to promote, an offense other than one of the offenses specifically

enumerated in 18 U.S.C. § 2332b(g)(5)(B)."   U.S.S.G. § 3A1.4, cmt. n.4(A)

(emphasis added).  The Court need only find that one of the bases delineated in

U.S.S.G. § 3A1.4, cmt. n.4(A) applies to support the application of this upward

departure.  Under this provision, the Court may increase the offense levels by 12

levels.  U.S.S.G. § 3A1.4(a) & cmt. n.4.  Based on the facts in this case, the United

States submits that an increase of three offense levels would be appropriate.

    The plain language of Nickels's voicemail threat and the timing of his call

demonstrate that Nickels intended to "influence or affect the conduct of government

by intimidation or coercion, or to retaliate against government conduct."  U.S.S.G.

§ 3A1.4, cmt. n.4.  Michigan held its general election on November 3, 2020, shortly

after which nationwide media channels publicized unsubstantiated allegations that

the Public Official and her locality, Rochester Hills, had deleted or modified election

files at the time of the 2020 presidential election that allegedly caused thousands of

votes for one candidate to be counted for a different candidate who ultimately did not prevail in the 2020 election.  Nickels was reportedly upset at the outcome of the election.  Then, Nickels targeted a local election official in Michigan from his residence in Indiana.

Prior to the State's certification of the general election vote, but after the publicizing of these allegations, Nickels called the Public Official and left the voicemail charged in this case.  Nickels referred to allegations that the Public Official was involved in fraud and irregularities in the election: "We're watching your fucking [] mouth talk about how you think that there's no irregularities.  Guess what, the CIA and Deep State under Obama's fucking [], and guess what, they used the hammer device, they used the score card.  And you frauded out America of a real election, where Donald Trump blew your fucking lying ass out of the water."

Additionally, Nickels made a demand:  "We will fucking demand an audit, we will demand the truth, and you will fucking pay for your fucking lying ass remarks you fucking [] little liberal ass lying RINO."  Finally, in the same voicemail, Nickels repeatedly threatened the life and safety of the Public Official: "[Y]ou're gonna pay for it, you will pay for it"; "ten million plus patriots will surround you when you least expect it, and your little infantile Deep State security agency has no time to protect you because they'll be bought out and we'll fucking kill you"; "we will fucking take you out"; "fuck your family, fuck your life, and you deserve a

fucking throat to the knife"; and "watch your fucking back, you fucking silly bitch, watch your fucking back []."

U.S.S.G. § 3A1.4, cmt. n.4(A) clearly applies here. Nickels's language and the timing of his voicemail show that Nickels's message "was calculated to influence or affect the conduct of government by intimidation or coercion," U.S.S.G. § 3A1.4, cmt. n.4(A), specifically, to intimidate the victim into changing how she performed her role in administering elections by means of a threat to her life and safety. Further, Nickels intended the message "to retaliate against government conduct." *Id*. Nickels referred to his awareness of purported allegations that the Public Official had engaged in election fraud during her administration of the 2020 general election and accused the Public Official of "lying" and covering up such allegations. Nickels directed his death threats to the Public Official to retaliate against this perceived conduct in her role as a local government official.

The United States requests that the Court recognize Nickels's offense for what it was—an act intended to intimidate and coerce a public official into taking action related to unfounded allegations of fraud, and to retaliate against her for administering an election—and depart upward by three offense levels under Note 4 to the terrorism enhancement.

C.     Adjustment for Single Instance with Little to No Deliberation

The United States submits that U.S.S.G. § 2A6.1(b)(6), Single Instance with Little or No Deliberation Adjustment, does not apply.  For this adjustment to be applicable, Defendant must have shown "little or no deliberation" in committing the offense conduct. U.S.S.G. § 2A6.1(b)(6).

Here, the offense conduct shows deliberation on its face.  The language in the voicemail reflects that Nickels targeted the victim due to her election-related duties as a city clerk.  It can be inferred from Nickels's language in the charged threat that Nickels learned about his public official victim through sources sufficient to inform his beliefs and perceptions that (1) the victim was a government official involved in election administration, (2) had committed a perceived transgression during the 2020 election, (3) should be targeted with Nickels's death threat, (4) this attempt at intimidation or coercion would materially change how the victim acted in her official capacity, and (5) this change would bring about the desired result for Nickels with regard to the election.  Further, the offense conduct required that Nickels learn about the victim, conduct a search for how to contact the victim and her office, and utilize the victim's phone number.

The steps that Nickels took to make the call as described above evince deliberation in a manner similar to *United States v. Stevenson*, a case to which

Nickels cites.   (ECF No. 20, PageID.120.)[7]   In *Stevenson*, the court denied the incarcerated defendant the single-instance adjustment after he sent a single threatening letter to a probation officer, and the Fifth Circuit panel affirmed this decision on appeal.   126 F.3d 662, 665 (5th Cir. 1997).   The Fifth Circuit found that the defendant's "actions involved the deliberate securing of stationery and postage, the composition of a letter, the search for an address, and the act of taking the letter to be mailed."   *Id.*   Nickels's voicemail threat was not spontaneous conduct evincing little to no deliberation, and the single-instance adjustment is not applicable here.

## III.   SENTENCING RECOMMENDATION

Nickels's conduct warrants a sentence within the Guidelines range that reflects an upward departure of three offense levels under U.S.S.G. § 3A1.4, cmt. n.4, but is not less than 24 months of imprisonment, which would be sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553. Should the Court determine that Nickels's Guidelines range is lower than 24 months, the United States submits that an upward variance is appropriate here.

---

[7]   Contrary to his assertions, ECF No. 20, PageID.120, Nickels did not identify himself as the caller.  Further, that Nickels did not attempt to carry out his threat, *id.*, is irrelevant to both the charged offense and U.S.S.G. § 2A6.1(b)(6).

A.    The Nature and Circumstances of the Offense and the History and
      Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The nature and circumstances of Nickels's offense conduct justifies the term

of imprisonment that the United States seeks here.   Nickels pled guilty to the

indictment, charging one count of violating 18 U.S.C. § 875(c), which criminalizes

"transmit[ting] in interstate or foreign commerce any communication containing any

threat to kidnap any person or any threat to injure the person of another." 18 U.S.C.

§ 875(c).  Nickels intentionally targeted the Public Official with a death threat in an

attempt to intimidate her for her role in the administration of elections in Michigan.

Nickels left his message on November 10, 2020, days after the general election in

Michigan, accusing the Public Official of election fraud and then threatening her and

her family with death.  Nickels used exceptionally vituperative threatening language

in this voicemail to ensure that the Public Official would feel terrorized.

The targeting of the Public Official during the 2020 general election

underscores the seriousness of the offense conduct here.   Criminally threatening

public officials for simply doing their job is never warranted, regardless of Nickels's

views on Michigan's election results or its election administration, or how politically

charged or heated Nickels believed the issues to be.  The nature and circumstances

of Nickels's offense conduct warrant a term of imprisonment within the Guidelines

range that reflects an upward departure of three offense levels, but is not less than

24 months of imprisonment.

B.   <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))</u>

The United States's sentencing recommendation accounts for the seriousness of the offense.  Nickels left a voicemail containing extremely threatening statements, targeting the Public Official for her role in the administration of elections in Michigan.  Nickels called the Public Official, referenced his anger surrounding his beliefs about alleged election irregularities, and demonstrated his willingness to incite fear to intimidate and coerce her into changing her behavior and performing her duties as Nickels wished.  A sentence here should account for the seriousness of the offense, which strikes at one of our core democratic institutions: the administration of free and fair elections.

The United States attaches here impact statements by Michigan Secretary of State Jocelyn Benson and individuals and organizations familiar with the Public Official, which detail the serious impact of Nickels's threatening statements both on the Public Official and on election officials and workers in general. *See* Victim Impact Statement by Secretary of State Jocelyn Benson, Michigan Dep't of State (June 27, 2024) (attached as Exhibit A);  Victim Impact Statement by Lawrence Norden and Elizabeth Howard (July 2, 2024) (attached as Exhibit B); Victim Impact Statement by Jennifer Morrell and Noah Praetz, The Elections Group (July 2, 2024) (attached as Exhibit C); Victim Impact Statement by Barbara Comstock, *et al.*,

National Council on Election Integrity and Issue One (June 19, 2024) (attached as Exhibit D).

As these statements show, Nickels's conduct is serious. Threats like Nickels's "are meant to terrorize election administrators and prevent them from doing their job . . . ." (Ex. A, Mich. Sec'y of State Benson Statement, at 1.) Nickels put at risk the Public Official's life, and he irrevocably changed how she lived and worked. (Ex. B, Norden and Howard Statement, at 2.) Nickels's voicemail caused deep fear and apprehension among the Public Official and her family members. When Nickels threatened the Public Official, "something innate was stolen from her and her family." (Ex. C, The Elections Group Statement, at 2.) Nickels's message "will forever inform her decisions, consciously or subconsciously," and she "will carry its traumatic impact with her." (*Id.*) "Beyond the terror that [the Public Official] felt in the days and weeks after being threatened, this ongoing effect represents the impact on her." (*Id.*)

The Public Official viewed Nickels's voicemail message as a threat to her life; it even caused her to physically react with nausea. (PSR, ¶ 8). And she reacted to Nickels's voicemail as a grave threat by taking measures to protect herself and her family such as installing security cameras and flood lights around her home. (*Id.*) She also asked her neighbors to be on the lookout for potential security risks. (*Id.*) These are exactly the effects that Nickels intended.

Whether Nickels intended to carry out his death threats is of no relevance.  "A death threat is a cruel and dangerous attack that forever alters a person's life.  It erodes their sense of personal safety and heightens their feelings of fear and mistrust, not just at work, but in every part of their life at all hours of the day."  (Ex. A, Mich. Sec'y of State Benson Statement, at 1.)   Such threats "can cause a range of psychological impacts on the individuals who receive them, impacting them and their families in both the short and long term."  (Ex. D, Comstock, *et al*. Statement, at 1.)

Further, Nickels's conduct—threatening a public official—undermines the rule of law itself.  As described below, public officials and workers who administer elections have faced a growing number of threats to their lives and the safety of their families, and such threats have often disrupted or made more difficult the functioning of government and the administration of elections.  Given Nickels's conduct, a meaningful sentence is necessary to promote respect for the law.

The United States's recommended term of imprisonment in this case is in line with sentences imposed in similar cases in which defendants threatened the lives and safety of election officials and workers in attempts to intimidate them, undermining the rule of law.  In *United States v. Joshua Russell*, No. 22-cr-01661, in the District of Arizona, the court imposed a sentence of 30 months after defendant pled guilty to one count of violating 18 U.S.C. § 875(c) for leaving three voicemail messages

containing death threats for an election official in Arizona during the state's primary elections and prior to the certification of the election results. In *United States v. Mark Rissi*, No. 22-cr-01283, in the District of Arizona, the court took into account significant mitigation information and imposed a sentence of 30 months after defendant pled guilty to two counts of violating 18 U.S.C. § 875(c) for leaving two threatening voicemail messages for an election official in Arizona and the then-Arizona Attorney General related to the defendant's grievances about the public officials' roles in an election.

Finally, the recommended term of imprisonment would provide just punishment commensurate with the serious harm that Nickels caused. Nickels caused the Public Official and her family members to fear for their lives and safety. He took an irreversible toll on the Public Official. He caused her to take protective measures to ensure her safety. And, with his coercive, intimidating, vengeful death threat, Nickels threatened the broader system of free and fair election administration in the State of Michigan.

C.  The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

The recommended term of imprisonment would adequately serve the purpose of general deterrence. The United States possesses no information that indicates that Nickels will commit similar offenses in this district. However, election officials and workers report that they are targeted by threats across the nation, and this disturbing

17

trend underscores the need for general deterrence.

According to one survey, for instance, 38 percent of local election officials report being threatened, abused, or harassed in recent years, and 54 percent reported being concerned about the safety of their colleagues and/or staff.[8]  Over one-quarter of local election officials are concerned about their family members being threatened or harassed.[9]  Further, 70 percent of local election officials feel that threats have increased in recent years.[10]  There are serious effects to threats such as the ones charged here.  For instance, over 50 percent of local election workers are concerned that threats, harassment, and intimidation will harm the retention and recruitment of workers to administer elections.[11]

Such challenges to the retention and recruitment of election officials and workers have very real consequences on election administration in Michigan: "The drum beat of harassment faced by election workers does serious harm to election administration operations, and losing seasoned administrators who are tired of enduring harassment drains experience and expertise from this highly technical

---

[8]  *See Local Election Officials Survey*, Brennan Center for Justice at 3 (May 2024), *available at* https://www.brennancenter.org/our-work/research-reports/local-election-officials-survey-may-2024; *see also* Ex. B, Norden and Howard Statement.

[9]  *Id*.

[10]  *Id*. at 11.

[11]  *See Local Election Officials Survey*, Brennan Center for Justice at 3 (Apr. 2023), *available at* https://www.brennancenter.org/our-work/research-reports/local-election-officials-survey-april-2023; *see also* Ex. D, Comstock, *et al*. Statement.

field." (Ex. A, Mich. Sec'y of State Benson Statement, at 1.) High turnover among election officials and workers is expensive due to costs "to search for, hire, and train new staff" on election administration processes and equipment specific to each office.[12] Further, the loss of institutional knowledge can present serious challenges to the administration and security of elections.[13]

Election officials and workers need to be able to administer and run free and fair elections safely and securely. A Guidelines sentence of at least 24 months of imprisonment could push those who would criminally threaten election officials and workers to reconsider their planned conduct, as the public becomes increasingly aware that such criminal conduct can have serious consequences. Further, the victims—and all individuals who administer our elections—deserve to be able to do their jobs without fear and intimidation, and to know that those who choose to threaten them will face just punishment.

## IV.   Conclusion

For the foregoing reasons, the United States respectfully requests that the Court sentence Nickels to a term of imprisonment within the Guidelines range that reflects an upward departure of three offense levels under U.S.S.G. § 3A1.4, cmt.

---

[12] *See* Michael Beckel, *et al.*, Issue One, *The High Cost of High Turnover*, at 8 (Sept. 2023), https://issueone.org/wp-content/uploads/2023/09/The-High-Cost-of-High-Turnover-Report.pdf.

[13] *Id.* at 9-10.

n.4, but is not less than 24 months of imprisonment, to be followed by a period of

supervised release.


                                        Respectfully submitted,


DAWN N. ISON                            MATTHEW F. BLUE
United States Attorney                  Chief, Counterterrorism Section


/s/ Frances Lee Carlson                  /s/ Tanya Senanayake
FRANCES LEE CARLSON                     TANYA SENANAYAKE
Assistant U.S. Attorney                 Trial Attorney, Counterterrorism Section
211 West Fort Street, Suite 2001        National Security Division
Detroit, MI 48226                       U.S. Department of Justice
frances.carlson@usdoj.gov               950 Pennsylvania Ave. NW, Ste. 7600
(313) 226-9100                          Washington, DC 20530
                                        Tanya.Senanayake3@usdoj.gov
                                        (202) 514-0849


Dated: July 2, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the parties of record.

*/s/ Tanya Senanayake*
TANYA SENANAYAKE
Trial Attorney, Counterterrorism Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave. NW, Ste. 7600
Washington, DC 20530
Tanya.Senanayake3@usdoj.gov
(202) 514-0849